IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re | ) Case 22-bk-01957 |
| | ) |
| Michael Scott Mogan | ) Ch. 11 |
| | ) |
| Debtor. | ) Judge: Honorable David D. Cleary |
| | ) |

**Debtor's Opposition To United States Trustee's Motion To Dismiss And Response to Motion For Conversion Under Chapter 7**

Michael Mogan **("Debtor")** hereby files this opposition to the United States Trustee for the Northern District of Illinois (the "U.S. Trustee") moves pursuant to 11 U.S.C. § 1112(b), motion for an order dismissing the above captioned Chapter 11 case for "cause." Debtor also responds to the U.S. Trustee's request converting the case under Chapter 7. In support of the Motion, Debtor states as follows:

### I. INTRODUCTION

1. No cause exists to dismiss the chapter 11 case as Debtor has expeditiously prosecuted the bankruptcy case and Debtor contends he has proposed a confirmable plan in filing the third amended plan. Debtor also has not continuously operated on a negative monthly cash flow thus there is no substantial or continuing loss to or diminution of the estate.

2. For these reasons, the U.S. Trustee has not established cause to dismiss the case. There has been no harm to creditors, thus the Motion to dismiss should be denied.

### II. RELEVANT PROCEDURAL AND BACKGROUNT FACTS

3. According to the Debtor's Schedule A/B, he has an ownership interest in, among other things, a condominium or cooperative valued at $270,000 and a 2007 Mercedes CLK550 valued at $7,000 (the "Assets"). Dkt No. 10.

1

4. Debtor filed a second amended plan on July 9, 2024 (Dkt. No. 210) which plan was not confirmed as Debtor did not receive the required votes from the impaired creditors.

5. On July 31, 2024, this Court ordered the Debtor to show cause as to why the Bankruptcy Case should not be dismissed. Dkt No. 222. The Debtor filed a response and several supplemental responses and ultimately filed a Second Amended Plan which proposed to pay the United States Department of Education (DOE) (it's largest creditor) a total of $21,561 over a 3-year plan. Dkt. No. 210

6. Shortly after the November 13, 2024 hearing on the second amended plan Debtor reached out to Mr. DeCelles, counsel for the U.S. Department of Education, to discuss how to proceed with Debtor's pending adversary complaint seeking discharge of his student loans if the Court did not confirm the second amended plan. The U.S. Department of Education and Debtor agreed that Debtor would no longer seek discharge of his student loans in this case and add the following language in the third amended plan:

> The plan does not provide for payment of the Department of Education's claim. In exchange, the Debtor agrees that he will stipulate to the dismissal of the adversary proceeding filed against the Department of Education, No. 23 A 171, that the debt owed to the Department of Education will not be discharged in this bankruptcy case, whether or not this case is converted, and that he will not file another adversary proceeding against the Department of Education in this bankruptcy case, whether or not this case is converted. In addition, notwithstanding this plan or the automatic stay, the Department of Education is permitted to service and collect the student loans it holds that are owed by the Debtor.

7. Debtor filed the third amended plan with such language December 8, 2025 shortly after the Court denied confirmation of the second amended plan. Debtor failed to and should have discussed filing the third amended plan with the Court instead of filing it so quickly however Debtor's intention was to prosecute the case to confirmation in filing the third amended plan which Debtor contends can be confirmed as there are no impaired creditors. Furthermore although Debtor  filed the third amended plan hastily he had engaged in discussions with teh

2

U.S. Department of Education how to resolve his pending adversary complaint seeking discharge of his student loans weeks earlier.

8.  The third amended plan included plan payments of only $12,325 based upon six bi-annual payments of $2,054 which Debtor can afford. This amount is significantly less than what was required in the second amended plan.

**The Debtor's Monthly Operating Reports Do Not Indicate Debtor He Has Continuously Operates on a Negative or Low Monthly Cash Flow**

9.  The following is a summary of from Debtor's Schedule A-1 which amounts are also reported in the monthly operating reports for the period January 2024 through January 2025:

**Self employment**

|  | Income | Expenses | Net | Net Wages | Living Expenses | Net Cash |
|---|---|---|---|---|---|---|
| **2024** | | | | | | |
| January | $2,840 | $2,304 | $536 | $0 | $1,156 | ($14) |
| February | $3,661 | $638 | $3,024 | $0 | $1,451 | $1,273 |
| March | $4,399 | $2,156 | $2,243 | $0 | ($3,424) | (1,197) |
| April | $6,271 | $2,348 | $3,923 | $0 | $2,513 | $1,393 |
| May | $6,210 | $2,043 | $4,167 | $0 | $2,130 | $1,618 |
| June | $2,774 | $2,515 | $259 | $0 | $2,008 | ($2,168) |
| July | $1,190 | $916 | $274 | $0 | $932 | ($867) |
| August | $3,911 | $1,271 | $2,640 | $0 | $2,125 | ($514) |
| Sept. | $6,679 | $5,266 | $1,143 | $3,015 | $1,368 | $2,256 |
| Oct. | $5,586 | $3,322 | $2,264 | $3,319 | $3,192 | $2,026 |
| Nov. | $5,350 | $2,193 | $3,157 | $1,517 | $3,089 | $1,584 |
| Dec. | $2,000 | $4,448 | ($2,448) | $1,877 | $3,737 | ($5,023) |
| **2025** | | | | | | |
| January | $1,800 | $4,483 | ($2,683) | $2,770 | $2,728 | ($3,239) |

3

10. The following is a summary of Debtor's cash balances at the end of each month from January 2024 through January 2025 for each of Debtor's bank accounts as evidenced by the bank statements filed with the Debtor's monthly operating reports:

| **2024** | **Capital One** | **Bank of America** | **Total** |
|---|---|---|---|
| January | $487 | $20 | $507 |
| February | $1,403 | $111 | $1,514 |
| March | $930 | $53 | $983 |
| April | $2,243 | $159 | $2,402 |
| May | $3,871 | $233 | $4,104 |
| June | $1,859 | $54 | $1,913 |
| July | $178 | $24 | $202 |
| August | $488 | $5 | $493 |
| September | $3,270 | $101 | $3,371 |
| October | $8,579 | $222 | $8,801 |
| November | $9,138 | $740 | $9,878 |
| December | $5,262 | $261 | $5,523 |
| **2025** | | | |
| January | $3,166 | $174 | $3,340 |

Thus Debtor has not operated on a negative monthly cash flow and there is no substantial or continuing loss to or diminution of the estate and he has the positive operating cash flow to make the required plan payments of $12,325 in accordance with the third amended plan.

11. Debtor also now earns an annual salary of $100,000 as of January 1, 2025 which replaced the seasonal nature of tax accounting work Debtor has earned in recent years. Even without the additional wages it is clear Debtor has the positive cash flow to pay the plan payments of $12,325 which pays the remaining unsecured general creditors 100% of the amount they are owed.

4

### III. Argument

#### A. No Cause Exists To Dismiss The Case

12. The court must convert a case to chapter 7 or dismiss the case if there is 'cause' to do so" unless the debtor can establish one of the exceptions. See *In re Aurora Memory Care, LLC*, 589 B.R. 631, 638 (Bankr. N.D. Ill. 2018). Once cause is established, the debtor has the burden of proving the required exceptions to fend off conversion or dismissal. Id. To fend off conversion or dismissal, the court must find "unusual circumstances" "establishing that converting or dismissing the case is not in the best interest of creditors and the estate." 11 U.S.C. §1112(b)(2). And, the debtor or another party must establish (A) there is a reasonably likelihood that a plan will be confirmed as provided for in sections 1121(e) and 1129(e) or within a reasonable time if those section do not apply and (B) "the grounds for converting or dismissing the case include an act or omission of the debtor other than paragraph [§1112(b)] (4A) – (i) for which there exists a reasonable justification for the act or omissions; and (ii) that will be cured within a reasonable period of time fixed by the court." Id. Cause also includes the "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. §1112(b)(4)(A); In re LG Motors, Inc., 422 B.R. 110, 116 (Bankr. N.D. Ill. 2009). There are two elements to consider under Section 1112(b)(4)(A): (i) a "substantial or continuing loss to or diminution of the estate," and (ii) the "absence of a reasonable likelihood of rehabilitation." See 11 U.S.C. § 1112(b)(4)(A). Neither elements are present here based on Debtor's positive cash flow and profitable business income no such cause exists.

#### B. There Is No Negative Nor Low Cashflow That Demonstrates a Substantial and Continuing Loss to the Estate.

13. The first prong is not met because there is no substantial and continuing loss to the estate.

The first element, a continuing diminution of the estate, can be satisfied by showing "that the debtor continues to incur losses or maintains a negative cash-flow position after the entry of the order for relief or that the debtor's assets have declined in value since the case was commenced." *In re Creekside Senior Apts., L.P.* 489 B.R. 51, 61 (B.A.P. 6th Cir. 2013) (citation omitted). Debtor's available cash increased in the second half of 2024 which will continue and he has not suffered negative cash flow thus the first prong is not met and Debtor's earnings have increased in 2025.

### C. Debtor Has Established a Reasonable Likelihood of Rehabilitation, And Has Sufficient Income to Support a Plan

14. With respect to the second element, rehabilitation has been defined as whether the debtor will be able to reestablish its business— "the standard under section 1112(b)(4)(A) is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort." *In re Costa Bonita Beach Resort Inc.*, 479 B.R. 14, 43 (Bankr. D.P.R. 2012) (quoting 7 Collier on Bankruptcy ¶ 1112.04[6][a][ii]). Moreover, courts have found that a debtor lacks a reasonable likelihood of rehabilitation where its only source of income is speculative. See In re Original IFPC Shareholders, Inc., 317 B.R. 738, 743–44 (Bankr. N.D. Ill. 2004). As stated in the monthly income amounts above over the last year, Debtor's income had increased even before he had began earning the $100,000 salary on January 1, 2025. Therefore, neither of the prongs of the statutory test set forth in 11 U.S.C. § 1112(b)(4)(A) have been established, and no cause exists to dismiss this case.

### D. The Unusual Circumstance Exception Also Applies

15. To fend off conversion or dismissal, the court must find "unusual circumstances" "establishing that converting or dismissing the case is not in the best interest of creditors and the

6

estate." 11 U.S.C. §1112(b)(2). And, the debtor or another party must establish (A) there is a reasonably likelihood that a plan will be confirmed as provided for in sections 1121(e) and 1129(e) or within a reasonable time if those section do not apply and (B) "the grounds for converting or dismissing the case include an act or omission of the debtor other than paragraph [§1112(b)] (4A) – (i) for which there exists a reasonable justification for the act or omissions; and (ii) that will be cured within a reasonable period of time fixed by the court." Id.

16. It was not until on or about October 30, 2024 that Debtor learned that the US Department of Education would not cast a ballot in favor or in opposition to the second amended plan at which time Debtor essentially had no choice to proceed in seeking relief under Chapter 11 without still seeking discharge of his student loans.

17. Debtor also had three separate group of individuals repeatedly engage in violations of the automatic stay under the Bankruptcy Code, two of which are the law firms of Klinedinst PC and O'Melveny Myers LLP and a third group of individuals who are employees of the California State Bar. Debtor had sought to stay civil proceedings in February 2022 in the District Court in Northern California yet his efforts were opposed by Klinedinst PC and O'Melveny Myers LLP and such civil and appellate proceedings followed in the Ninth Circuit Appeals and United States Supreme Court for approximately two years where they each were involved in pursuing attorney fees from Debtor only to later abandon such efforts inside and/or outside of the Bankruptcy Court. The California State Bar also had attempted to force Debtor to pay a debt he listed as disputed on his debt schedules and they later commenced civil proceedings against Debtor which they refused to dismiss until Spring of 2024. All such efforts caused Debtor significant personal injuries and while Debtor opposed such misconduct this took time away from Debtor increasing his income and assets and prosecuting this case. Debtor had also requested he be given until

7

August 2023 to file the initial plan and should have set the original plan for a confirmation hearing much sooner however while this case was pending he was continuously harassed by Klinedinst PC, O'Melveny and Myers LLP and the California State Bar despite their knowledge that Debtor's bankruptcy petition was pending. Their intentions clearly were to force Debtor into a Chapter 7 bankruptcy.

18. Debtor was also hospitalized in April 2022 after commencement of the Chapter 11 proceedings and has had to monitor his health continuously since.

### D. Student Loan Deferment and Income Based Repayment Plan

19. Debtor entered deferment on his student loans upon filing of his initial Chapter 13 petition. Once the automatic stay ends Debtor's monthly student loan payments will be based on his eligible federal student loan debt, family size, and income. As with most borrowers Debtor's monthly payment amount will be capped at 10% or 15% of his discretionary income (depending on when you received your first loans). Debtor's discretionary income is the difference between his Adjusted Gross Income (AGI) and 150% of the poverty line amount for his family size and state. Debtor has not enrolled in the plan yet and will upon successful confirmation of the third amended plan or in the alternative Debtor plans to still seek discharge of his student loans if this case is converted to a Chapter 7 case.

### E. Conversion To Chapter 7

20. The US Trustee also seeks in the alternative that this case be converted under Chapter 7. Debtor had independently originally filed a motion that this case be converted to a Subchapter V case or in the alternative to convert this case to a Chapter 7 case. Debtor had filed such motion in the event the Court would not enable Debtor to seek confirmation of the third amended plan. After the Court permitted Debtor to seek confirmation of the third amended plan Debtor

withdrew such motion and also at the request of the U.S. Trustee as well. Thus if Debtor is unable to confirm the third amended plan Debtor does not oppose converting this case to a Chapter 7 case. A chapter 7 case would enable Debtor to pursue discharge of his student loans thus he would not have to dismiss the pending adversary complaint against the United States Department of Education.

## IV. CONCLUSION

21. Based upon the foregoing, Debtor respectfully requests this Court enter an order (1) denying the Motion dismissing the Bankruptcy Case or (2) granting such other and further relief as this Court deems just and appropriate including conversion of this case to Chapter 7 if the third amended plan cannot be confirmed.

Date: February 26, 2024

                                              Respectfully submitted,

                                              _s/Michael Mogan_

Michael Mogan                                              Michael Mogan
4803 N. Milwaukee Ave, Suite B Unit #244        Debtor
Chicago, IL 60630
mm@michaelmogan.com
(773) 799-8477